**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON**

**ALLEN DALE FARLEY,**

      **Plaintiff,**

**v.**                                    **CASE NO. 2:11-cv-0362**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

      **Defendant.**

**M E M O R A N D U M  O P I N I O N**

      This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  Both parties have consented in writing to a decision by the United States Magistrate Judge.  Currently pending before the court is Plaintiff's Motion for Summary Judgment.[1]

      Plaintiff, Allen Dale Farley (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on September 1, 2006, alleging disability as of February 5, 2004, due to problems with knees/hands/arms/back/shoulders, pain, overweight, high blood pressure, severe headaches, and fatigue.  (Tr. at 16, 154-59, 160-66, 217-24, 237-42, 249-57, 281-86, 290-95.)  The claims were denied initially and upon reconsideration.  (Tr. at 16. 71-75, 76-

---

[1]    The court reminds Plaintiff that pursuant to Local Rule of Civil Procedure 9.4(a), the parties need not file motions in support of judgment on the pleadings or motions for summary judgment. Instead, Plaintiff should file "a brief in support of the complaint," while Defendant files "a brief in support of the defendant's decision."  Local Rules of the United States District Court for the Southern District of West Virginia, Local Rule of Civil Procedure 9.4(a).

80, 83-85, 86-88, 89-93, 94-98, 104-06, 107-09.)   On January 15, 2009, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 110.)  The video hearing was held on June 1, 2010 before the Honorable Harry C. Taylor, II.  (Tr. at 35-62, 119, 126.)  By decision dated June 11, 2010, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 16-28.)  The ALJ's decision became the final decision of the Commissioner on March 15, 2011, when the Appeals Council denied Claimant's request for review.  (Tr. at 1-4.)  On May 20, 2011, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. §§ 404.1520, 416.920 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. §§ 404.1520(a), 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. §§ 404.1520(b), 416.920(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. §§ 404.1520(c), 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. §§ 404.1520(d), 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is

2

whether the claimant's impairments prevent the performance of past relevant work.  Id. §§ 404.1520(e), 416.920(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.   20 C.F.R. §§ 404.1520(f), 416.920(f) (2002).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date.  (Tr. at 18.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of degenerative disc and joint disease of the spine, obesity, and osteoarthritis of the shoulder, knees, and hands.  (Tr. at 18-21.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 21-22.)  The ALJ then found that Claimant has a residual functional capacity for sedentary work, reduced by nonexertional limitations.  (Tr. at 22-26.)  As a result, Claimant cannot return to his past relevant work.  (Tr. at 26-27.)  Nevertheless, the ALJ concluded that Claimant could perform jobs such as shipping and receiving router, assembler, and time keeper, which exist in significant numbers in the national economy. (Tr. at 27-28.)  On this basis, benefits were denied.  (Tr. at 28.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was 48 years old at the time of the administrative hearing. (Tr. at 39.) He has a high school education and a Regents Bachelor of Arts degree. (Tr. at 41.) In the past, he worked as a computer specialist, including computer programming and website design, at a community and technical college, and as a teacher/tutor at a church. (Tr. at 42-44, 57.)

4

<u>The Medical Record</u>

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below.

On May 31, 2003 and June 1, 2003, Claimant was treated at The University Hospital Emergency Department for a cough with right rib pain.  (Tr. at 307-11, 440-42.) Sadhna Verma, M.D. stated chest x-ray findings to be: "The cardiac and mediastinal contours are normal. The lungs are clear...IMPRESSION: 1) NO ACUTE DISEASE." (Tr. at 307-08, 443-44.)

On September 9, 2003, Claimant was treated at The University Hospital for a "thoracic muscular strain, lumbar strain."  (Tr. at 312.) Thomas A. Tomsick, M.D. stated that x-rays showed: "IMPRESSION: NEGATIVE EVALUATION OF THE LUMBAR SPINE...MILD DEGENERATIVE CHANGES IN THE MID THORACIC SPINE.   NO EVIDENCE OF FRACTURES."  (Tr. at 312-14; 436-37.)

On February 13, 2004, Claimant was treated at The University Hospital Emergency Department for "headache, bloating, diarrhea." (Tr. at 315-18, 432-35.)  He was diagnosed with gastroenteritis (stomach flu).  (Tr. at 319.)

On December 12, 2006, Joseph Skeens, M.D., radiologist, provided a radiology report to Jules J. Barefoot, M.D. evaluating Claimant's right and left knees.  He concluded:

> RIGHT KNEE TWO VIEWS
> There is a moderate degree of osteoarthritis with no acute fracture or joint effusion.
> IMPRESSION
> Moderate osteoarthritis; no acute fracture.
> LEFT KNEE TWO VIEWS
> There is a moderate degree of osteoarthritis with no acute fracture or joint effusion.
> IMPRESSION:

Moderate osteoarthritis.

(Tr. at 326.)

On December 13, 2006, a State agency medical source completed an Internal Medicine Examination of Claimant for the West Virginia Disability Determination Service. (Tr. at 320-26.) The evaluator, Jules J. Barefoot, M.D. stated that Claimant's allegations were "[k]nee problems, right and left hand and arm problems, pain, overweight, and severe headaches." (Tr. at 320.) Dr. Barefoot noted Claimant's surgeries to be: "1. Open-reduction/internal fixation, left, first metacarpal fracture. 2. Tonsillectomy." Id. He further noted Claimant to be "morbidly obese" at "[h]eight 66 inches, weight 338 pounds." (Tr. at 321.) He concluded:

DIAGNOSTIC IMPRESSION:
1. Osteoarthritis of the knees.
2. Morbid obesity.
3. Chronic headaches.
4. Osteoarthritis of the hands.

DISCUSSION: This is a 45-year-old, white male who has complaints of polyarticular joint pain, particularly affecting his hands, knees, and lower back. On his examination today, he was noted to have a marked amount of crepitus present in both knees, right greater than left. He had no evidence of any joint redness, warmth, or edema. He had no evidence of any limb discrepancy or muscle asymmetry. He does complain of chronic bilateral hand pain. He had no evidence of carpal tunnel syndrome on his examination.

This examinee's ability to do significantly strenuous, work-related activity does appear to be moderately impaired. On the basis of his morbid obesity and his degenerative joint disease present in both knees. His ability to bend, squat, crawl, and climb does appear to be moderately impaired. He is able to hear, see, speak, and understand normal conversational speech. His ability to grasp, lift, and carry did appear to be normal, as was his ability to grossly and finely manipulate objects.

(Tr. at 322.)

On January 10, 2007, a State agency medical source completed a Physical Residual Functional Capacity Assessment which stated Claimant's primary diagnosis as "s/p Fx. L. Ist. Meta-carpal/ORIF [Open Reduction Internal Fixation]," his secondary diagnosis, "back pain/arthralgias" and his "other alleged impairments: Obesity level III."  (Tr. at 328.)  The evaluator, A. Rafael Gomez, M.D., opined that Claimant could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk and sit (with normal breaks) for about 6 hours in an 8-hour workday with unlimited ability to push and/or pull. (Tr. at 329.)  Dr. Gomez found that Claimant could frequently do all postural limitations save climbing ladder/rope/ scaffolds and crawling, which he could do occasionally.  (Tr. at 330.)  Dr. Gomez concluded that Claimant had no manipulative, visual or communicative limitations.  (Tr. at 331-32.)  Claimant had no environmental limitations save to avoid concentrated exposures to vibration and hazards.  (Tr. at 332.)  Dr. Gomez commented: "Patient is credible.  He has chronic pain of the left hand.  He had a fracture of the left 1st meta-carpal with ORIF.  He has chronic back pain with decrease in ROM's.  Has multiple arthralgias and obesity level III.  The neurological findings are intact.  He is reduced to medium work."  (Tr. at 333.)

On April 6, 2007, a State agency medical source completed a Physical Residual Functional Capacity Assessment which stated Claimant's primary diagnosis as "moderate osteoarthritis R and L knees," his secondary diagnosis, "minimal degenerative changes thoracic sp [spine]" and his "other alleged impairments: s/p fx : 1st MCP w/ ORIF."  (Tr. at 337.)  The evaluator, Amy Wirts, M.D., opined that Claimant could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk and sit (with normal breaks) for about 6 hours in an 8-hour workday with limited ability to push and/or

7

pull in lower extremities: "mild limitation BLE [bilateral lower extremity], no repetitive pushing, pedaling and stomping." (Tr. at 338.) Dr. Wirts found that Claimant could occasionally do all postural limitations. (Tr. at 339.) Dr. Wirts concluded that Claimant had no manipulative, visual or communicative limitations. (Tr. at 340-41.) Claimant had no environmental limitations save to avoid concentrated exposures to extreme cold, vibration and hazards. (Tr. at 341.) Dr. Wirts commented:

> Claimant's allegations are mostly credible. Claimant has moderate OA [osteoarthritis] of R [right] and L [left] knees. He has a moderate amount of crepitation in both knees R > [greater than] L. He has normal ROM and is able to ambulate without the use of an assistive device. Allegations do not meet listing level severity using SSA criteria.

(Tr. at 342.)

On March 20, 2008, Claimant was treated at Logan Regional Medical Center Emergency Department after he fell at home and had complaints of left wrist/hand and right arm/shoulder pain. (Tr. at 378-90.) X-rays were analyzed by Torin P. Walter, M.D., who determined:

> RIGHT SHOULDER...There are degenerative changes about the AC joint and the greater tuberosity. There is no acute bony abnormality or dislocation...

> RIGHT WRIST...There is a well corticated density at the medial aspect of the distal radius. There is no acute bony abnormality...

> LEFT WRIST...No acute bony abnormality...

> RIGHT HAND...No acute bony abnormality...

> LEFT HAND...There is a cortical screw through the base of the first metacarpal related to a prior internal fixation. There are degenerative changes at the radiocarpal joint and also within the trapezium. There is no acute bony abnormality.

> RIGHT FOREARM...No acute bony abnormality.

8

(Tr. at 385-90.)

Records indicate Claimant was treated at Community Health Foundation of Man on March 28, 2008 for right/left hand and right forearm pain.  (Tr. at 349-50.)  George B. Wilson, M.D. reviewed x-rays of Claimant's right forearm and both hands. (Tr. at 350.)  He concluded: "RIGHT FOREARM...no acute bony abnormality, fracture, or dislocation.  No significant degenerative changes are seen...LEFT HAND...There is an orthopedic screw through the base of the first metacarpal.  There is no acute bony abnormality or fracture. RIGHT HAND...There is no acute bony abnormality, fracture, or dislocation. No significant degenerative changes are seen." Id.

On April 1, 2008, Claimant was treated Ramanathan Padmanaban, M.D. for right forearm pain after a fall, and on October 30, 2008, and November 20, 2008 for bilateral knee pain. (Tr. at 370-76.) Although the handwritten notes are largely illegible, the note dated November 20, 2008 clearly states: "He does not want cortisone or any injection to knees."  (Tr. at 371.)

On April 30, 2008, Robert Perez, M.D. completed a form titled "West Virginia Department of Health and Human Resources Medical Review Team (MRT)" wherein he indicated Claimant was 68 inches tall, weighed 330 pounds, and was "normal" in the following areas:  speech, posture, gait, eyes, ears, mouth/teeth, nose/throat, neck, lymphatic system, breasts, lungs/chest, hart, abdomen, hernia, varicose veins, edema, psychiatric, arteriosclerosis, genito-urinary, and ano-rectal. (Tr. at 346-47, 445-47.) "Neurological" and "Orthopedic" were not checked as "normal" due to "chronic lower back and joint pain." (Tr. at 347, 447.)  Dr. Perez recommended: "Pain management, weight reduction, blood pressure monitoring...chronic lower back and joint pain affecting his

capacity to work effectively."  (Tr. at 348.)

On August 18, 2008, Claimant was provided prescriptions for medication refills by Community Health Foundation.  (Tr. at 349-53.)

On September 18, 2008, a State agency medical source completed an Internal Medicine Examination of Claimant for the West Virginia Disability Determination Service. (Tr. at 354-60.)  The evaluator, Kip Beard, M.D. stated that Claimant's allegations were "joint pain and back pain, and high blood pressure...He is not using over-the-counter medications for pain, as he complains that they 'fog my head up'...The claimant has been treated for hypertension now for about one month...[no] end-organ damage related to it." (Tr. at 354-55.)  Dr. Beard concluded:

> IMPRESSIONS:
> 1.    Chronic thoracolumbar strain.
> 2.    Chronic cervical strain.
> 3.    Chronic arthralgia (a) X-ray evidence of osteoarthritis.
> 4.    Hypertension.
> 5.    Morbid obesity.
>
> SUMMARY: The claimant is a 46-year-old male with a history of back pain. The examination of the back today reveals some pain, tenderness and concern for falling with motion testing and motion loss.  Straight leg raising is negative.  Reflexes are symmetric.  There was no neurologic compromise. A lumbar x-ray from 2003 on the chart is negative.
>
> There are also complaints of joint pain.  The examination today reveals some slight intermittent crepitus at the shoulders.  No obvious crepitus of the knees.  There is some range of motion abnormalities present.  There was no evidence of any inflammatory arthritis today.  X-rays on the chart note some degenerative findings in one of the wrists and about the AC joint of the shoulder.

(Tr. at 358.)

On October 3, 2008, a State agency medical source completed a Physical Residual Functional Capacity Assessment which stated  Claimant's primary diagnosis as "shoulders,

arms and hands pain," his secondary diagnosis, "low back and knees pain" and his "other alleged impairments: Morbid obesity, BMI 51.5." (Tr. at 361.) The evaluator, Marcel Lambrechts, M.D., opined that Claimant could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk and sit (with normal breaks) for about 6 hours in an 8-hour workday with limited ability to push and/or pull in upper extremities. (Tr. at 362.) Dr. Lambrechts found that Claimant could occasionally do all postural limitations except climbing ladder/rope/scaffolds, which he marked "never." (Tr. at 363.) Dr. Lambrechts concluded that Claimant had no manipulative limitations save "reaching all directions" due to "pain and AC crepitus in right shoulder." (Tr. at 364.) He found Claimant had no visual or communicative limitations. (Tr. at 364-65.) Claimant had no environmental limitations save to avoid concentrated exposures to extreme cold and vibration, and to avoid even moderate exposure to hazards. (Tr. at 365.) Dr. Lambrechts commented:

> This claimant is on Rx [medication] for HBP [high blood pressure] and has good result. He had a T-spine XR [x-ray] that showed mild degenerative changes only. A LS-spine XR was negative. He also complained of his arms and hands. He has mild decrease in ROM [range of motion] as noted. He has knee pain too but I believe that his morbid obesity may account for most of his problems. residual functional capacity is reduced.

(Tr. at 366.)

On December 10, 2008, a State agency medical source provided a "Case Analysis" of Claimant's records. (Tr. at 377.) The evaluator, Rabah Boukhemis, M.D. concluded: "Prior residual functional capacity done on 10/30/08. Light. No new evidence, or allegations. Please affirm previous RFC." Id.

On September 21, 2009, March 15, 2010, and April 12, 2010, Claimant was treated

by N. B. Tuanquin, M.D. (Tr. at 458-61.)  The handwritten notes are completely illegible. Id.

On October 15, 2009 through October 18, 2009, Claimant was treated at Logan Regional Medical Center for chest pain.  (Tr. at 391-417.)  He underwent a cardiac stress test and was assessed by Sandra Ogden, C-FNP [Certified - Family Nurse Practitioner]: "ASSESSMENT:  1.  Chest pain syndrome, suspicious for ischemia.  2.  Obesity.  3. Hypertension."  (Tr. at 404.) Claimant was "transferred to St. Francis Hospital for higher level of cardiac care and treatment."  (Tr. at 421.)

On October 19, 2009 and October 20, 2009, Claimant was treated at St. Francis Hospital for acute coronary syndrome.  (Tr. at 418-31, 448-52.)  On October 20, 2009, Mitchell Rashid, M.D. stated:

INDICATIONS: Acute coronary syndrome.

PROCEDURE:
1.     Left heart catheterization.
2.     Selective coronary angiography.
3.     Left ventriculogram.
4.     Intravascular ultrasound to the left anterior descending coronary artery.
5.     Right common femoral angiogram with Angio-Seal deployment…

IMPRESSION:
1.     Severe myocardial bridging in the mid to distal left anterior descending coronary artery.
2.     Normal left ventricular function.

PLAN: Medical therapy and risk factor modification.  Discontinue the hydrochlorothiazide and lisinopril. Add aspirin and Plavix and verapamil-SR 120 mg daily with up titration for blood pressure and heart rate.  Will follow up in my office in four to six weeks.  Will plan percutaneous intervention to the left anterior descending coronary artery in the mid to distal segment if fails medical prescription.

(Tr. at 418-20, 424-26, 449-50.)

On November 12, 2009, Claimant was treated at Logan Regional Medical Center for left flank pain.  (Tr. at 484-86.)  James Keith Watson, M.D. reported that a CT of the abdomen for renal stone study was performed and his impression was: "Moderate left hydroureteronephrosis secondary to a 1.1 cm UVJ calculus...1.3 cm soft tissue density as seen on image #40.  This is of uncertain significance.  Would recommend clinical correlation and consider ultrasound for further characterization."  (Tr. at 484-85.)

On January 13, 2010, Dr. Rashid, M.D. saw Claimant for a follow-up visit and reported that Claimant was "337 lbs...5' 6"...Assessment: Chest pain, unspecified, 786.50; Hypertension, Benign Essential 401.1; Obesity, unspecified 278.00; Palpitations 785.1. PLAN: Instructions - Return to clinic in 6 months...Call or RTC [return to center] if symptoms worsen or persist."  (Tr. at 453-55.)

On April 15, 2010, Claimant was given a sleep study at Logan Regional Medical Center to determine if he had sleep apnea. (Tr. at 462-72.) Kamel Marzouk, M.D. concluded: "This study is positive for mild obstructive sleep apnea/hypopnea syndrome and significant snoring.  Please order Cpap titration study."  (Tr. at 472.)

On June 18, 2010, Claimant's representative supplied a list of Claimant's medications:  "Verapamil SA 180 mg...Slow heart rate...Plavix...Blood thinner...Nexium...Stomach irritation... Lortab...Osteoarthritis...Nitroglycer 0.4 mg...Chest pain... Hydrochlorot 12.5 mg...Fluid retention." (Tr. at 488.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ "disregarded the medical evidence of his attending physician and found that the claimant was capable of performing the full range of sedentary level work

and that he could return to some type of occupation in the national economy." (Pl.'s Br. at

2.) Claimant argues:

> Judge Taylor…misconstrued and failed to give proper weight to the evidence submitted on behalf of the claimant. Judge Taylor properly found that the claimant had severe impairments, namely degenerative disc and joint disease of the spine, obesity, and osteoarthritis of the shoulder, knees, and hands.

> Judge Taylor erred in not giving sufficient weight to the claimant's problems with obesity…It is necessary to consider the additional and cumulative effects of obesity on the individual when assessing a claim for disability.

> Although Judge Taylor noted the claimant's height and weight and the fact the claimant was obese, he did not assess the claimant's obesity and how it impacted his severe impairments.

> Dr. Jules Barefoot…found marked crepitation in both knees…Dr. Padmanaban showed crepitus in both knees.  He had reduced range of motion and the diagnosis was bilateral knee pain and osteoarthritis.

> The claimant's obesity in combination with his osteoarthritis of the shoulder, knee and hands and degenerative disc and joint disease of the spine, prevents the claimant from performing any work on a sustained basis.

> The claimant has a history of pain and limitation of motion in his weight bearing joints and spine based upon physical examinations by treating and examining physicians.  Furthermore, he has x-ray evidence of arthritis in the spine and weight bearing joints.  This, in combination with his morbid obesity, makes all activities of daily living very painful and laborsome.

(Pl.'s Br. at 5-6.)

The Commissioner's Response to Claimant's Challenges

The Commissioner responds that substantial evidence supports the Commissioner's

decision that Claimant could perform a significant number of sedentary jobs.  (Def.'s Br. at

10-14.) The Commissioner argues:

> The ALJ recognized that Plaintiff's impairments, whether singly or in combination, caused a significant limitation in his physical ability to do basic work activities.  That is why the ALJ found that Plaintiff's impairments were "severe" (Tr. 18, Finding No. 3)…But the ALJ reasonably accounted for

14

Plaintiff's limitations by limiting him to a significantly reduced range of sedentary work (Tr. 22, Finding No. 5).

Plaintiff claims that the ALJ "disregarded the medical evidence and medical records of his attending physician" (Pl.'s Br. at 2). There is no merit to that contention...the ALJ carefully reviewed all medical evidence and, in so doing, came to the reasonable conclusion that Plaintiff could still perform a range of sedentary work. The ALJ then assessed an appropriate RFC, which is the ALJ's responsibility at the administrative hearing level...Not only did the ALJ not "disregard" any of the medical evidence, he provided an exhaustive analysis of the evidence he considered...(Tr. 23-26).

Plaintiff argues that the ALJ "erred in not giving sufficient weight to [his] problems with obesity" and failed to assess his obesity and "how it impacted his severe impairments" (Pl.'s Br. at 5). Once again, Plaintiff's arguments are unavailing...

Plaintiff does not allege that his condition meets or equals in severity the criteria of any of the impairments in the Listing of Impairments. Thus, there is no dispute as to the ALJ's evaluation of obesity at step three of the sequential evaluation (Tr. 21, Finding No. 4). Going forward, it is clear that the ALJ considered Plaintiff's obesity when assessing his residual functional capacity and his ability to work. There is ample support in the record for the ALJ's determination that Plaintiff could perform a reduced range of sedentary work...there is no support for Plaintiff's contention that his obesity causes such extreme functional limitations that he can do no work whatsoever.

(Def.'s Br. at 10-14.)

Analysis

Weighing Medical Opinions

Claimant first argues that the ALJ "disregarded the medical evidence of his attending physician and found that the claimant was capable of performing the full range of sedentary level work and that he could return to some type of occupation in the national economy." (Pl.'s Br. at 2.) The court notes that Claimant does not name the "attending physician" but concludes that it must be Dr. Padmanaban, because he and consulting examiner, Dr. Barefoot, are the only physicians cited by Claimant. (Pl.'s Br. at 5-6.)

The Commissioner responded: "There is no merit to that contention...the ALJ carefully reviewed all medical evidence and... assessed an appropriate RFC...Not only did the ALJ not "disregard" any of the medical evidence, he provided an exhaustive analysis of the evidence he considered...(Tr. 23-26)."  (Def.'s Br. at 10.)

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2010).  These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency (5) specialization, and (6) various other factors.  Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."  Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner.  Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources).  Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given.  Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion.  Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area

of specialty).

In evaluating the medical evidence, the ALJ made these findings regarding the

medical evidence of record from Dr. Padmanaban:

> In October and November 2008, records from Dr. Padmanaban showed
> crepitus in both knees and the claimant was prescribed Celebrex and
> Prevacid. Upon examination the claimant's range of motion in the knees was
> reduced, peripheral pulses were 2+ and sensation was intact. Dr.
> Padmanaban's assessment was bilateral knee pain and osteoarthritis. The
> claimant did not want injections to the knees, and was advised to reduce
> weight and follow up with his treating physician (Exhibit 11F). The
> undersigned gives great weight to the observations, diagnoses, and opinions
> of this treating physician insofar as it is consistent with the other medical
> evidence of record.

(Tr. at 25, 370-76.)

Although, this physician is not referred to in Claimant's argument, he may be

referring to Robert Perez, M.D. who evaluated Claimant on April 30, 2008. (Tr. at 346-48.

445-47.)  The ALJ made these findings regarding Dr. Perez's assessment:

> On April 30, 2008, an assessment by Robert Perez, M.D., showed chronic
> lower back and joint pain. However, posture and gait were normal (Exhibits
> 5F and 14F). He opined the claimant was unable to perform full-time work,
> but did not indicate any length of time (Exhibit 5F and 1fF). This opinion on
> an issue reserved to the Commissioner of Social Security is given no weight
> as it is conclusory, and is not supported by the medical record as a whole.

(Tr. at 24.)

Regarding Claimant's assertion that the ALJ "disregarded the medical evidence of

his attending physician", the court has thoroughly reviewed the medical evidence of record

and finds that the ALJ properly considered the medical evidence of record, including those

records identified as being from treating physicians, in a very thorough analysis. (Tr. at 22-

26.)  The undersigned notes that Claimant offered no details as to how the ALJ specifically

"disregarded" evidence nor identified the "attending physician," and the undersigned has

17

found no such evidence.

Obesity and Combined Effects

Claimant next argues that the ALJ "erred in not giving sufficient weight to the claimant's problems with obesity...and how it impacted his severe impairments." (Pl.'s Br. at 5-6.)

The Commissioner responded that "it is clear that the ALJ considered Plaintiff's obesity when assessing his RFC and his ability to work...Plaintiff does not allege that his condition meets or equals in severity the criteria of any of the impairments in the Listing of Impairments. Thus, there is no dispute as to the ALJ's evaluation of obesity at step three of the sequential evaluation (Tr. 21, Finding No. 4)." (Def.'s Br. at 10-11.)

The social security regulations provide,

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

20 C.F.R. § 404.1523 (2009). Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." Oppenheim v. Finch, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. Id. The cumulative or synergistic effect that the various impairments have on claimant's ability to work must be analyzed. DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983).

18

SSR 02-01p explains that certain provisions of the listings instruct ALJs to "consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity." SSR 02-01p, 2000 WL 628049, at *1 (September 12, 2002).

The court finds that the ALJ's decision reflects a careful consideration of Claimant's impairments, both alone and in combination in keeping with the applicable regulation and Social Security Ruling ("SSR") 02-01p related to obesity.  See 20 C.F.R. § 404.1523 (2010) and SSR 02-01p, 2000 WL 628049, at *1 (September 12, 2002).  The ALJ considered the combined effect of Claimant's impairments in determining their severity and in arriving at a residual functional capacity finding.  Regarding Claimant's obesity and combination of impairments, the ALJ made these findings:

> The claimant's degenerative disc disease of the spine does not meet any listing in 1.04, Disorders of the Spine, because there is no evidence of nerve root compression characterized by neuroanatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); spinal arachnoiditis; or lumbar spinal stenosis resulting in pseudoclaudication and resulting in an inability to ambulate effectively.

> The claimant's osteoarthritis of the shoulder, hands, and knees does not meet any listing in 1.02, Major Dysfunction of a Joint, which is defined as major dysfunction of a joint characterized by gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion of the affected joint(s) and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction or ankylosis of the affected joint(s) with involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively; or involvement of one major peripheral joint in each upper extremity resulting in inability to perform fine and gross movements effectively (20 C.F.R. Part 404, Subpart P, Appendix 1).

> Although obesity is no longer a listed impairment, Social Security 02-1p requires Administrative Law Judges to consider obesity in determining

19

> whether claimants have medically determinable impairments that are severe, whether those impairments meet or equal any listing, and finally in determining the residual functional capacity. The Clinical Guidelines issued by The National Institutes of Health define obesity as present in general where there is a body mass index (BMI) of 30.0 or above. BMI is the ratio of an individual's weight in kilograms to the square of his or her height in meters (kg/m2). We generally rely upon the judgment of a physician as to whether an individual is obese.

(Tr. at 21-22.)

The diagnosis of a physical impairment does not compel a finding of disability. The impairment must prevent a claimant from performing any substantial gainful activity in the national economy. 20 C.F.R. §§ 404.1505(a), 416.905(a). Claimant bears the burden of proving disability, and has not met that burden. 20 C.F.R. §§ 404.1512, 416.912. Claimant has provided no support for his argument that obesity, osteoarthritis, and degenerative disc/joint disease prevent him from performing any work on a sustained basis. (Pl.'s Br. at 6.) The ALJ considered all of Claimant's limitations in his residual functional capacity assessment and in his hypothetical question to the vocational expert, wherein he specifically asked the VE to consider an individual who "suffers from degenerative disc disease and degenerative joint disease of the lumbosacral spine creating pain going into both extremities...He also suffers from obesity. Probably is at least 100 pounds overweight. He could probably only occasionally do the postural movements...there would be a restriction for the use of the right upper extremity in reaching..." (Tr. at 59.)

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this court.

The Clerk of this court is directed to transmit copies of this Order to all counsel of record.

**ENTER**: June 20, 2012

Mary E. Stanley
United States Magistrate Judge